IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALAN H. DONN | : | CONSOLIDATED UNDER |
| | : | MDL-875 |
| Plaintiff, | : | |
| | : | Transferred from the |
| v. | : | Southern District of New York |
| | : | (Case No. 10-00311) |
| | : | |
| A. W. CHESTERTON CO., INC., | : | E.D. PA CIVIL ACTION NO. |
| et al., | : | 2:10-CV-62071-ER |
| | : | |
| Defendants. | : | |

**FILED**

FEB - 1 2012

MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                          FEBRUARY 1, 2012

TABLE OF CONTENTS

I.     BACKGROUND.................................................2
II.    LEGAL STANDARD.............................................3
III.   DISCUSSION................................................4
       A.    Preemption.........................................4
             1.    Field Preemption............................6
                   a.    Applicable Law........................6
                   b.    Analysis.............................7
             2.    Conflict Preemption........................16
                   a.    Applicable Law.......................16
                   b.    Analysis............................17
       B.    Political Question Doctrine.......................22
             1.    Applicable Law.............................22
             2.    Analysis...................................24
                   a.    Defendants' Arguments
                         Under the Baker Factors..............24
                   b.    The Political Question Doctrine's
                         Limited Use..........................26
                   c.    Recent Cases Invoking the Political Question
                         Doctrine in Government Contracts..........28
                   d.    The Political Question Doctrine's Effect on
                         the Government Contractor Defense.........31
IV.    CONCLUSION...............................................32

Since the beginning of the Republic, the Federal Government has relied upon private parties to supply military equipment in connection with the national defense.  Over the years, the relationship between the Government and these private contractors has led to innumerable court decisions adjudging the rights and duties of not only these parties, but of third parties affected by the relationship as well.  This litigation has formed a web of legal principles grounded upon notions of federal supremacy and separation of powers.  In this case, Defendants, private parties who contracted with the Federal Government to supply military equipment to the Navy and who are being sued by a former Naval serviceman under state law, seek to disentangle this web by pulling on the strings of preemption and the political question doctrine.

For the reasons that follow, these efforts are unavailing.

## I.    BACKGROUND

Plaintiff Alan Donn ("Plaintiff") brought suit against a variety of defendants for injuries sustained from asbestos exposure.  Plaintiff was diagnosed with malignant mesothelioma and subsequently brought suit for damages against Defendants CBS Corporation and General Electric Company (collectively, "Defendants"), among others.  Pl.'s Compl. ¶ 3.  Plaintiff served

2

as an active-duty serviceman in the United States Navy aboard several nuclear submarines from approximately July 1, 1957 to July 1, 1981.  Id. ¶ 4.  Plaintiff avers that he was exposed to asbestos while aboard these vessels.  With respect to Defendants, Plaintiff avers that the Navy insulated with asbestos the hot metal casings on the vessels' propulsion turbines, which were manufactured by Defendants.  See Defs.' Br. in Supp. of Mot. to Dismiss Pl.'s Compl. 2, Dec. 2, 2010, ECF No. 33 ("Defs.' Opening Br.").  These turbines were specifically designed to use asbestos, and Defendants built the turbines pursuant to Navy contracts.  See id.  Plaintiff contends that Defendants knew of the dangers of asbestos and failed to warn Plaintiff of such dangers.  See Pl.'s Br. Opp'n Defs.' Mot. to Dismiss 1-2, Feb. 4, 2011, ECF No. 66 ("Pl.'s Br.").

Defendants filed the instant Motion to Dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(1), contending that the Court lacks subject matter jurisdiction over Plaintiff's claims.  Plaintiff responded to the motion, and the Court held oral argument.  The motion is now ripe for disposition.

## II.  LEGAL STANDARD

Defendants move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) arguing that the Court lacks subject matter jurisdiction.  In particular, Defendants argue that

3

Plaintiff's cause of action is preempted, and, in the alternative, argue that this case presents a non-justiciable political question.  See Defs.' Opening Br. 1-2.  When assessing these arguments, as they are both factual attacks on the Court's subject matter jurisdiction, the Court may look beyond the pleadings to consider whether jurisdiction is proper in this Court.  See Cestonaro v. United States, 211 F.3d 749, 752 (3d Cir. 2000).  Plaintiff has the burden to prove that subject matter jurisdiction exists.  Lightfoot v. United States, 564 F.3d 625, 627 (3d Cir. 2009).

## III. DISCUSSION

The Court first addresses Defendants' argument that Plaintiff's claims are preempted.  Secondly, the Court considers Defendants' alternative argument that this case presents a non-justiciable political question.

### A.    Preemption

The Supremacy Clause provides that the laws of the United States "shall be the supreme Law of the Land."  U.S. Const. art VI, cl. 2.  Out of this command, Congress may preempt state action in three ways: "State action may be foreclosed by express language in a congressional enactment, by implication from the depth and breadth of a congressional scheme that

4

occupies the legislative field, or by implication because of a
conflict with a congressional enactment." Lorillard Tobacco Co.
v. Reilly, 533 U.S. 525, 541 (2001) (internal quotation marks and
citations omitted).

Express preemption requires that a federal law's
language expressly displace state law. Kurns v. A.W. Chesterton,
Inc., 620 F.3d 392, 395 (3d Cir. 2010), cert. granted on other
grounds, 131 S. Ct. 2959 (2011). Additionally, implied
preemption may be found in two scenarios: either through (1)
field preemption, when the federal regulation is so sweeping that
no state law can occupy that field, or (2) conflict preemption
when either complying with federal and state law simultaneously
is impossible, or if complying with state law prevents the full
enforcement of the federal law. Id.

In this case, Defendants do not contend that express
preemption is present. Rather they rely upon implied preemption
because either federal law and regulations occupy the field of
Plaintiff's state tort law failure to warn claims,[1] or, federal
law and regulations conflict with Plaintiff's state tort law
failure to warn claims.

---

[1]    The Court refers to Plaintiff's claims as being brought
under state law for simplicity only.  The Court takes no
position, nor is the issue before the Court, of which law, state
or otherwise, applies to Plaintiff's claims.  Nor does the Court
opine upon whether Defendants' arguments would have any force if
Maritime law governed Plaintiff's claims.

1.   Field Preemption

Defendants argue that the federal regulation of
national defense is pervasive, and the federal interest in
national defense dominates over state law.  Thus, there is "no
room for state law of any kind."  Defs.' Opening Br. 38.
Specifically, Defendants urge upon the Court that as the war
powers[2] and various federal regulations related to national
defense are purely federal interests in which the states have not
traditionally regulated, Plaintiff's claims must be preempted.

a.   Applicable law

Field preemption is the most sweeping of the three
preemption doctrines, displacing all state laws within a
particular area of federal interest.  When determining whether
this doctrine applies, the Court must focus on whether the intent
of the federal law was to displace an entire body of state law in
that field.  See Altria Grp., Inc. v. Good, 555 U.S. 70, 76
(2008).  Moreover, the Court considers "the intended purpose of

---

[2]    The war powers are those powers relating to the
military contained within Articles I and II of the Constitution.
See U.S. Const. art. I, § 8, cl. 11-14 (empowering Congress to
"declare War," "raise and support Armies," "provide and maintain
a Navy," and "make Rules for the Government and Regulation of the
land and naval Forces"); id. art. II, § 2 ("The President shall
be Commander in Chief of the Army and Navy of the United States,
and of the Militia of the several States, when called into the
actual Service of the United States . . . .").

the federal regulatory scheme, and what impact any state
regulation would have on that scheme." <u>Kurns</u>, 620 F.3d at 395.
In areas where states have traditionally legislated there is a
presumption against preemption, in areas that are uniquely
federal, however, such presumption has less force.  <u>United States</u>
<u>v. Locke</u>, 529 U.S. 89, 108 (2000).

             b.    <u>Analysis</u>

        Field preemption analyses require courts to carefully
balance the interests of the Federal Government and those of the
states.  The inquiry is framed by federalism concerns and
grounded in Supremacy Clause jurisprudence.  As its name
suggests, under the Supremacy Clause, federal law supersedes
state law in areas where federal and state interests clash or
overlap.  Even in areas that are of a unique federal interest,
such as this case, which implicates national defense concerns,
there must be some clear and manifest purpose from the Federal
Government to preempt state law.  <u>See</u> <u>Medtronic, Inc. v. Lohr</u>,
518 U.S. 470, 485 (1996).  Any analysis of implied preemption in
the context of Federal Government procurement of military
equipment from private contractors to be used in connection with
the national defense--whether it be field or conflict preemption-
-must begin with <u>Boyle v. United Technologies Corp.</u>, 487 U.S.
500, 505-06 (1988).  In <u>Boyle</u> Supreme Court undertook to balance

the interests of the Federal Government and the rights of the states in this context.

Boyle involved claims of negligent design of a military helicopter escape hatch that allegedly caused the death of the military pilot after the helicopter crashed off the Virginia coast. Id. at 502. The military contract pursuant to which the defendants designed the helicopter called for the escape hatch to open out. Id. One of Boyle's tort theories was that had the escape hatch opened inward--and thus the water pressure not restricted the hatch's opening--the decedent would have been able to escape. Id. at 503. The issue before the Supreme Court was whether private contractors acting pursuant to specifications in a government contract could assert a defense (generally referred to as the government contractor defense) to immunize them from suit.

The Supreme Court recognized that the procurement of military goods was a uniquely federal interest within the military's discretion. Id. at 507. And because this procurement was within the military's discretion, had the suit been brought against the United States, the discretionary function exception to the Federal Tort Claims Act ("FTCA") would have barred all claims for torts arising out of the procurement of military goods. Id. at 511. The Supreme Court held that private contractors could enjoy the same tort immunity as the Government

8

under the FTCA.[3]  Thus, claims under state tort law against government contractors are preempted when there is a significant conflict between the requirements of the government contract and the requirements of state tort law.  Id. at 512.  In order to enjoy the benefits of the government contractor defense, however, a private government contractor would have to satisfy the following three-prong test: (1) the United States approved reasonably precise specifications for the product at issue; (2) the equipment conformed to those specifications; and (3) it warned the United States about the dangers in the use of the equipment that were known to it but not to the United States.  Id.

Important, here, is that the Supreme Court recognized that state tort law would be displaced only in limited circumstances, rejecting the claim for sweeping preemption of all claims by servicemen and women against government contractors.  See id. at 509.  To that end, the Supreme Court expressly rejected basing preemption on an extension of the Feres

---

[3]     Technically, the FTCA waives sovereign immunity, and the discretionary function exception makes the FTCA inapplicable to acts falling under that exception.  28 U.S.C. § 2680(a) (2006).  Thus, the exception retains sovereign immunity for the United States under these circumstances.

doctrine,[4] which would have prevented suit against a government

contractor by any military personnel.[5]  <u>Id.</u> at 510.

---

[4]     The <u>Feres</u> doctrine states that the FTCA will not allow
redress against the Government for injuries to Armed Service
personnel sustained during their military service.  <u>Feres v.
United States</u>, 340 U.S. 135, 146 (1950).

[5]     Although <u>Boyle</u> was a conflict preemption case, its
teachings reflect the Supreme Court's balancing of federal and
state interests in the area of government procurement, and its
teachings are no less forceful in the context of field
preemption.  This Court has previously recognized that "under
[our] system, lower courts are obligated to follow both the
narrow holding announced by the Supreme Court as well as the rule
applied by the Court in reaching its holding."  <u>United States v.
Powell</u>, 109 F. Supp. 2d 381, 383-84 (E.D. Pa. 2000) (citing <u>Casey
v. Planned Parenthood</u>, 14 F.3d 848, 856-57 (3d Cir. 1994)
(examining role of Supreme Court precedent); <u>Loftus v. Se. Pa.
Transp. Auth.</u>, 843 F. Supp. 981, 984 (E.D. Pa. 1994) (same);
<u>Piazza v. Major League Baseball</u>, 831 F. Supp. 420, 437-38 (E.D.
Pa. 1993)).

        Indeed, "our system of precedent or stare decisis is .
. . based on adherence to both the reasoning and result of a
case, and not simply the result alone."  <u>Casey</u>, 947 F.2d at 692.
"If the rule were otherwise, the Supreme Court's 'limited docket'
would limit the Court's authority only to the 'handful of cases
that reached it.'"  <u>Powell</u>, 109 F. Supp. 2d at 384 (quoting
<u>Planned Parenthood v. Casey</u>, 947 F.2d 682, 691 (3d Cir. 1991),
<u>aff'd in part and rev'd in part on other grounds</u>, 505 U.S. 833
(1992)).  Thus, in this case, the Court must apply not only the
holding of <u>Boyle</u> but also the balancing of federal interests and
state interests that the Supreme Court made in that case.  In
fact, since <u>Boyle</u>, the Supreme Court stated that, in terms of
preemption cases, <u>Boyle</u> is a limited circumstance where federal
law will displace state tort law.  <u>See Correctional Servs. Corp.
v. Malesko</u>, 534 U.S. 61, 74 n.6 (2001) (explaining that <u>Boyle</u> was
a "special circumstance" in the case where the "government has
directed a contractor to do the very thing that is the subject of
the claim").  Thus, it is clear that <u>Boyle</u> stands for the rule
that displacement of state law in favor of the federal interest
in government procurement is a limited and "special
circumstance."  <u>Id.</u>

Having declined the invitation to preempt all claims based on state law against private military contractors, <u>Boyle</u> explained that while there may be situations where state law and federal interests directly conflict, "it is easy to conceive of an intermediate situation, in which the duty sought to be imposed on the contractor is not identical to one assumed under the contract, but is also not contrary to any assumed." <u>Id.</u> at 509.[6] The Supreme Court stated that "[n]o one suggests that state law would <u>generally</u> be pre-empted in this context." <u>Id.</u> (emphasis added). Further, even in a case where the requirements of a contract with the Government and state tort law directly conflicted, the Supreme Court explained that "it would be unreasonable to say that there is always a 'significant conflict' between the state law and a federal policy or interest." <u>Id.</u> Because in this general context <u>Boyle</u> seemingly rejected the very premise of the argument Defendants press upon the Court here, that federal laws and regulations occupy the field of state tort law, their argument must be similarly rejected here.

Nor do Defendants point to any congressional enactment that allows the Court to infer an intent to preempt the field of state tort law pertaining to failure to warn of asbestos's

---

[6]     Indeed, the instant case may fit more within the "intermediate situation" referred to in <u>Boyle</u> as the parties dispute whether or not Defendants could have simultaneously complied with their duties to the Government and their state law duty.  <u>See</u> <u>infra</u>, at 13, 17.

dangers on Naval ships.[7]  This congressional silence is persuasive because such congressional intent is the cornerstone for traditional field preemption cases.  See, e.g., Chamber of Commerce v. Brown, 554 U.S. 60, 73 (2008) (holding that California law providing funds to support unions was preempted by the National Labor Relations Act); Campbell v. Hussey, 368 U.S. 297, 301 (1961) ("Congress, in legislating concerning the types of tobacco sold at auction, preempted the field and left no room of any supplementary state regulation concerning those same types.").

Despite this congressional silence, Defendants argue that in the case of Navy servicemen and women serving aboard Navy ships there is always a significant conflict with respect to the duty to warn of asbestos dangers and, therefore, the Court should preempt the field of state tort law.  Defs.' Opening Br. 37-40.  The Court finds this argument unavailing.  Defendants contend that the affidavits of Admiral Roger B. Horne, Dr. Samuel A. Forman, and Dr. Lawrence S. Betts, all former Naval officers, support this argument.  Specifically, Defendants seem to argue that the affidavits make clear that, in the context of warnings about the danger of asbestos, the Navy had exclusive control over

---

[7]     To be sure, Defendants cite to military specifications in connection with several Naval officer affidavits.  These specifications support the conclusions made by the affiants and are discussed infra.

all aspects of warning servicemen and women.  See Horne Aff. ¶¶ 22, 30, 32, 37(b), Defs.' Opening Br. Exs. E1, E2; Forman Aff. ¶¶ 17, 25, 36, 37, 55, 56, Defs.' Opening Br. Ex. F; Betts Aff. ¶¶ 30, 43, 47, 49, 51, Defs.' Opening Br. Exs. G1, G2.

        To be sure, courts find field preemption in cases where "federal regulation [is] so pervasive [for] courts as to make reasonable the inference that Congress left no room for the States to supplement it."  Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947).  That is, in cases involving an area over which the Federal Government has exclusive control, such as foreign policy, the Supreme Court has sometimes found preemption absent some clear indication from Congress that it intended to preempt the field.  See Am. Ins. Assn. v. Garamendi, 539 U.S. 396 (2003); Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363 (2000).

        Yet, such cases do not affect the result here.  For example, in Crosby, the Supreme Court struck down a Massachusetts law that prevented state entities from conducting business with companies that did business in Burma because Congress had already enacted a law sanctioning Burma for its human rights violations. Crosby, 530 U.S. at 366-67, 73.  The state law was enacted to, in effect, sanction Burma.  Id. at 368.  Sanctioning a foreign nation is a decidedly federal power, and the Massachusetts law, which undermined this power, was preempted.  Id. at 375-76.

13

In contrast, this case involves a well recognized state function--tort law in the context of personal injury--not a specific state law directed at a decidedly federal power.  In cases where a state has demonstrated "traditional competence," but the state law affects an important federal interest, such as foreign relations, the Supreme Court has stated that field preemption is generally inappropriate and that "it might make good sense to require a conflict, of a clarity or substantiality that would vary with the strength or the traditional importance of the state concern asserted." Am. Ins. Ass'n, 539 U.S. at 420 n.11; cf. Hines v. Daivdowitz, 312 U.S. 52, 75 (1941) (Stone, J., dissenting) ("The Judiciary of the United States should not assume to strike down a state law which is immediately concerned with the social order and safety of its people unless the statute plainly and palpably violates some right granted or secured to the national government by the Constitution or similarly encroaches upon the exercise of some authority delegated to the Untied States for the attainment of objects of national concern.").

While Defendants proffer affidavits from former Naval officers concerning possible friction between Navy regulations and state law duty to warn that impacts the chain of command structure in the Navy, even assuming such affidavits are correct, the evidence is simply insufficient to "plainly and palpably"

14

show that the state duty to warn "violates some right granted or
secured," or "encroaches upon the exercise of some authority
delegated," to the Executive and Legislature to control the Navy.
Hines, 312 U.S. at 75 (Stone, J., dissenting).  Here, the naked
assertions of three Naval officers, regardless of pedigree, are
insufficient to show a clear and manifest purpose of the Federal
Government to preempt state law.

          At bottom, without sufficient evidence that locates
the intent to preempt state law within the Constitution, by
action of Congress, or some other federal policy to displace the
entire field of state tort law with respect to Plaintiff's claims
(i.e., asbestos exposure claims by servicemen aboard Naval
vessels), this case falls within the Boyle limiting principle.[8]
Accordingly, the Court holds that the war powers, federal
regulations, and law related to government procurement do not
occupy the field of state tort law as it relates to Defendants'
duty to warn.

---

[8]     Moreover, in cases where the Supreme Court has
preempted the field, it does not leave the plaintiffs empty
handed, but rather substitutes some federal common law regime.
Saleh v. Titan Corp., 580 F.3d 1, 31-32 (D.C. Cir. 2009)
(Garland, J., dissenting).  Defendants do not suggest some other
redress for Plaintiff, but simply request that the Court abandon
the field.  Such a result is inconsistent with precedent.  Id. at
32; see Clearfield Trust Co. v. United States, 318 U.S. 363, 366-
67 (1943).

### 2.   Conflict Preemption

As an alternative to their field preemption argument, Defendants contend that the Court lacks subject matter jurisdiction because the state tort claims at issue here--failure to warn--conflict with the concept that the "Federal Government (specifically, the President and Congress) exercise plenary control in the exercise of war powers, including military operations and the procurement and utilization of whatever goods and materials the Federal Government deems necessary to those operations." Defs.' Opening Br. 41.[9]  Like their field preemption argument, this argument lacks merit.

### a.   Applicable law

The doctrine of conflict preemption generally arises in two circumstances.  First, when there is actual direct conflict between federal law and state law.  See Boyle, 487 U.S. at 504. Second, even if there is no direct conflict, there is conflict preemption when "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153 (1982).  While in most cases there is a presumption against preemption, in cases that involve a uniquely federal

---

[9]      Not surprisingly, Defendants' conflict preemption argument has the sound and look of field preemption.

interest--such as this case--this presumption has less force.
See Locke, 529 U.S. at 108.  Moreover, in such cases, the
conflict between state and federal regulations need not be as
sharp as when the conflicting federal regulation is not one of
uniquely federal interest.  See Boyle, 487 U.S. at 507-08.
Nonetheless, "conflict there must be."  Id. at 508.

            b.   Analysis

            Just like under field preemption, in the case of a
government procurement contract, Boyle controls.  Defendants,
however, suggest Boyle does not foreclose the Court from finding
conflict preemption under the specific facts of this case.  In
support of their argument, Defendants point to testimony of
Admiral Horne, Dr. Forman, and Dr. Betts that states that the
Navy would not have allowed Defendants to warn of asbestos's
dangers.  See supra, at 12.  Plaintiff, on the other hand,
contradicts this evidence with testimony of his own expert that
the Navy would not have prevented Defendants from warning about
asbestos hazards.  See, e.g., Moore Aff. ¶ 27, ECF No. 67
("Adding warning labels to machinery and equipment supplied to
the Navy was easily accomplished and was not prohibited by the
Navy.").  Rather than taking this dispute out of Boyle's range,
the issue here goes to the heart of the Boyle test's first prong-
-whether the Navy issued reasonably precise specifications for

17

the product at issue.  Boyle, 487 U.S. at 512; see Willis v. BW IP Int'l Inc., No. 09-91449, --- F. Supp. 2d ---, 2011 WL 3818515, *7 (E.D. Pa. Aug. 29, 2011) (Robreno, J.) (holding that this battle of experts raises genuine issues of material fact concerning the applicability of the government contractor defense).

Yet, Defendants argue that the Court should "move beyond the government contractor defense" announced in Boyle and hold that the Court lacks subject matter jurisdiction over claims by servicemen and women against the Navy for its decisions regarding turbine design and use of asbestos insulation.  Id. at 50.  In support, Defendants rely upon Saleh v. Titan Corp., 580 F.3d 1 (D.C. Cir. 2009), where the plaintiffs were Iraqi citizens who alleged that the defendants participated in torture during interrogation along with the military at the Abu Ghraib military prison.  Id. at 2.  The military employed the defendants because there was a shortage of military personnel trained to perform these "critical wartime tasks."  Id.  It was claimed that the military outlined the protocol and techniques allowed for interrogations and the defendants assisted the military in interrogating prisoners.  Id.  The plaintiffs sued the defendants for the alleged torts committed upon them by the defendants during their interrogations.  Id.

18

The court in <u>Saleh</u> held that federal law preempted the plaintiffs' state tort law claims, based upon the combatant activities exception to the FTCA.[10]  This exception immunizes the military from "tort[s] from the battlefield."  <u>Id.</u> at 7. Analogizing to <u>Boyle</u>'s treatment of the discretionary function exception under the FTCA, the court explained that had the defendants been military personnel, the FTCA's combatant activities exception would preempt private action against the Government.  Thus, just as the Supreme Court extended the discretionary function of the FTCA, which protected the Government from liability for certain actions, the court in <u>Saleh</u> extended the combatant activities exception of the FTCA to government contractors.  Specifically, the court held that "[d]uring wartime, where a private service contractor is integrated into combatant activities over which the military retains command authority, a tort claim arising out of the contractor's engagement in such activities shall be preempted." <u>Id.</u> at 9. Defendants urge the Court to do the same thing--apply <u>Boyle</u> to create a new preemption holding for cases involving the Navy's use of asbestos in the turbines used to propel submarines.

---

[10]     The combatant activities exception to the FTCA's waiver of sovereign immunity excepts "any claim arising out of the combatant activities of the military or armed forces, or the Coast Guard, during time of war."  28 U.S.C. § 2680(j) (2006).

19

Saleh is not helpful to Defendants in this case.  In Saleh, the defendants performed a uniquely military service-- interrogation at a military prison during wartime.  In essence the Saleh defendants had stepped directly into the shoes of military personnel.  Here, by contrast, Defendants are not involved in military operations during wartime.  Rather, Defendants' role was to supply equipment to be used by the Navy aboard Naval vessels, a factual scenario squarely within the contours of Boyle and far afield from the circumstances in Saleh that prompted that court to look beyond Boyle.

Defendants urge the Court to recognize that cases involving design of equipping combat vessels and preparing servicemen and women for battle preempts state law tort claims because such cases are "inextricably intertwined with the over-riding objective that the Navy be ready to successfully fight wars and deter enemy aggression in the interests of national defense."  Defs.' Opening Br. 44.  Specifically, the Navy's strong interest in controlling the warnings used in connection with military equipment.

Defendants have failed to provide sufficient evidence for the Court to find that the Government's interest here is different than that in Boyle.  Indeed, the Supreme Court explained that "designing military equipment . . . is assuredly a discretionary function . . . ."  Boyle, 487 U.S. at 511.

20

Moreover, such design "involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness." Id. (emphasis added). These policy interests are equally forceful here.

Finally, Defendants' proposed expansion of Boyle is a prescription for a voyage to terra incognita. As Judge Garland stated in his Saleh dissent, "[o]nce we depart from the limiting principle of Boyle, it is hard to tell where to draw the line." Saleh, 580 F.3d at 23 (Garland, J., dissenting). In actuality, Defendants' request for the Court to move beyond Boyle under the doctrine of conflict preemption, without a limiting principle, would blossom into full field preemption.

Thus, in light of Boyle, this Court finds Defendants' argument that federal law preempts Plaintiff's failure to warn claims without regard to the three-prong Boyle test unavailing. And, the Court holds that neither field nor conflict preemption applies to Plaintiff's claims of failure to warn of the dangers of asbestos.

B.   Political Question Doctrine

In addition to Defendants' argument that Plaintiff's claims are preempted, Defendants also argue that Plaintiff's claims present a non-justiciable political question.

1. Applicable Law

The political question doctrine has deep roots in American jurisprudence. See Marbury v. Madison, 5 U.S. (1 Cranch) 137, 170 (1803) ("Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court."). At its core, "[t]he political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 230 (1986). Yet, "the fact that the resolution of the merits of a case would have 'significant political overtones does not automatically invoke the political question doctrine.'" Khouzam v. Attorney Gen. of U.S., 549 F.3d 235, 249-50 (3d Cir. 2008) (quoting I.N.S. v. Chadha, 462 U.S. 919, 942-43 (1983)). Indeed, the Court must be vigilant to not construe a "political case" as a "political question." Baker v. Carr, 369 U.S. 186, 217 (1962).

The modern treatment of the political question doctrine begins with Baker v. Carr.  In that case the Supreme Court held justiciable claims of malapportionment of state legislatures that violate the Equal Protection clause.[11]  In holding the claim justiciable, Baker provided the following six independent factors to guide the Court's justiciability determination:

> Prominent on the surface of any case held to involve a political question is found (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; (2) or a lack of judicially discoverable and manageable standards for resolving it; (3) or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; (4) or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; (5) or an unusual need for unquestioning adherence to a political decision already made; (6) or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Baker, 369 U.S. at 217.  A tangential relationship between the merits of a case and one of these six factors is insufficient for the Court to find that there is a political question; the factor must be "inextricable from the case at bar."  Id. at 217.

---

[11]    At the heart of the case was the issue of whether Congress or the courts were the proper vehicle to correct the alleged malapportionment.  Colegrove v. Green, 328 U.S. 549 (1946), had held only seventeen years before that the issue was for Congress to remedy, if at all, and non-justiciable for the courts.

2.   Analysis

Defendants contend that the Court will necessarily have to rule on the prudence of the Navy's use of asbestos.  See Defs.' Opening Br. 54.  Moreover, Defendants argue that the Court's adjudication of whether the Navy would have allowed or not allowed warnings--a key inquiry into the government contractor defense under Boyle--is non-justiciable.  See id. at 55-57.  Indeed, Defendants argue that any adjudicating of this suit requires the Court to second guess the Navy and its warning policies.  See id.

Plaintiff, on the other hand, argues that this suit is an ordinary tort suit between two private parties.  See Pl.'s Br. 71.  As such, the Court need not inquire or second guess any Naval policy on the use of asbestos.  See id. at 72.  Nor does the Court have to second guess the Navy's warning procedures.  See id. All the Court--and the fact-finder--must do is determine what the Navy did or did not allow with respect to warnings and rule on the liability of Defendants pursuant to well-defined state tort law principles.  See id.

a.   Defendants' Arguments Under the Baker Factors

Defendants invoke four of the Baker factors in support of their argument that Plaintiff's claims are non-justiciable.

24

In particular, Defendants argue that Plaintiff's claims are inextricable with any one of the following factors:

> (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; (2) or a lack of judicially discoverable and manageable standards for resolving it; (3) or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; (4) or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government.

Baker, 369 U.S. at 217.  Distilled to their essence, all four Baker factors ask whether, in deciding the case, the Court will pass judgment upon the policies and procedures of the Executive or the Legislature.  In the case at hand, the Court may perform its constitutional role without offending the doctrine of separation of powers.

Adjudicating whether Defendants were required to warn of the dangers of asbestos in connection with the supply of propulsion turbines to the Navy for use in Navy warships does not implicate a political question.  Plaintiff's claims do not challenge the Navy's wisdom in deciding to use asbestos, nor do they seek to second guess the Navy's judgment as to the wisdom or propriety of its warning policy.  Moreover, if successful, the claims will not make the Navy liable for any injury.

Rather, this action is between private parties based on well defined tort law principles.  It does not involve a challenge by a coordinate branch to another branch's decision.

25

It is not, in short, the type of struggle for inter-branch supremacy that the doctrine of separation of powers and its corollary, the political question doctrine, seeks to avoid.

To be sure, a judicial inquiry into what Navy policy was (in connection with equipment warnings) at the time Plaintiff served on a Navy vessel may be required. Yet, this inquiry does not implicate the wisdom and soundness of the Navy's policies or procedures. The issue here is what the policy was with respect to warnings, not what it might (or should) have been. Thus, none of the four Baker factors Defendants cite to are inextricable with the merits of Plaintiff's claims.

   b. The Political Question Doctrine's Limited Use

Even beyond the analysis of the Baker factors, the limited use of the political question doctrine counsels in favor of finding justiciability in this case. The invocation of the political question doctrine, and indeed a court's holding that a case presents a political question, does not call for a jurisdictional assessment of whether there is a "case or controversy" within the meaning of Article III. See Baker, 369 U.S. at 198-99; Erwin Chemerinsky, Constitutional Law: Principles and Policies 136 (4th ed. 2011).

Rather, courts find a political question when adjudication of the case causes concerns over, inter alia, the

26

separation of powers.  <u>Baker</u>, 369 U.S. at 210; <u>cf.</u> Chemerinsky,

<u>supra</u>, at 133-36 (summarizing arguments for and against the

political question doctrine and questioning whether it is a

constitutional or prudential doctrine).  This abdication,

however, is a limited one--courts have found political questions

in only a few discrete areas including issues related to "the

republican form of government clause and the electoral process,

foreign affairs, Congress's amendments, instances where the

federal court cannot shape effective equitable relief, and the

impeachment process."  Chemerinsky, <u>supra</u>, at 133 (collecting

cases).

          The only area arguably relevant to this case is that of

foreign affairs.  And, in that area the Supreme Court has found

non-justiciable claims in only limited areas and special

circumstances.  <u>See</u> <u>United States v. Belmont</u>, 301 U.S. 324, 330

(1997) (finding a political question on whether the Executive

recognized a foreign government); <u>Goldwater v. Carter</u>, 444 U.S.

996, 996 (1979) (finding a political question on the process for

ratification or recision of a treaty); <u>Commercial Trust Co. v.</u>

<u>Miller</u>, 262 U.S. 51, 57 (1923) (finding non-justiciable dispute

over when a war officially ends); <u>see also</u> <u>Holtzman v.</u>

<u>Schlesinger</u>, 484 F.2d 1307, 1309 (2d Cir. 1973) (dismissing

challenge to the president's use of the military without a

congressional declaration of war).  These limited areas are not at issue in this case.

  c. <u>Recent Cases Invoking the Political Question Doctrine in Government Contracts</u>

   While indeed some lowers courts have recently held claims against government contractors in the recent Iraq war non-justiciable, those cases are inapposite from this case.  For example, in <u>Carmichael v. Kellogg, Brown & Root Services Inc.</u>, the Eleventh Circuit found a political question pertaining to a government contractor's negligence.  572 F.3d 1271, 1296 (11th Cir. 2009).  In that case, the plaintiff was an Army soldier that was part of a convoy of vehicles transporting fuel in Iraq.  <u>Id.</u> at 1278.  The defendant's employee was driving one of the vehicles and crashed, causing injuries to the plaintiff.  <u>Id.</u> The court there held that adjudication of the case would require inquiry into sensitive military judgments because, while the defendant's employee was driving the tanker, the military exclusively controlled all aspects of the convoy including speed, route, how much fuel to transport, and the distance between vehicles.  <u>Id.</u> at 1281-82.

   Also, the Fourth Circuit recently held that a tort claim against a government contractor presented a political question.  <u>See</u> <u>Taylor v. Kellogg, Brown & Root Servs. Inc.</u>, 658 F.3d 402, 412 (4th Cir. 2011).  In that case, the plaintiff, a

Marine, was electrocuted and injured while installing a electronic wiring box on a military base in Iraq.  Id. at 403-04. In particular, the plaintiff was seeking to add a power generator to the Tank Ramp[12] in order to alleviate recurrent power outages. Id.  In order to do this, the plaintiff had to install a wiring box.  Id.  The defendant was a government contractor that was to provide repairs to the same electrical system that the plaintiff was repairing.  Id.  The military advised the defendant not to turn on power to that system until the plaintiff had finished his work.  Id.  Despite this warning, the defendant did turn on the electrical power, and the plaintiff was electrocuted.  Id.  The military policy in place was that the Tank Ramp did not have a secondary power source and that all additions of back-up power had to be approved.  Id. at 406.  The Tank Ramp was not approved for back-up power and, thus, the plaintiff was acting without approval when he installed the wiring box.  Id.

There, the court held that an adjudication of the plaintiff's negligence claims against the defendant presented a political question because the defendant asserted a contributory negligence defense against the plaintiff for acting outside of military policy.  Id. at 412.  Because of this defense, the court concluded that it would necessarily have to decide "whether back-

_____

[12]    A Tank Ramp was the area on the military base used for maintenance of tanks, assault vehicles, and Humvees.  Taylor, 658 F.3d at 404.

up power should have been supplied to the Tank Ramp area,"
clearly invoking a political question.   Id. (quotations omitted).

          These cases traverse a common thread different from
this case.   They require the courts to second guess military
operational judgment, whether that be the speed and timing by
which to send a military convoy through Iraq, or the wisdom of
the military's procedures for electrical repairs.   Indeed,
adjudicating the claims in Carmichael and Taylor would require
the Court to determine in hindsight whether the military policy
was correct.   In turn, this adjudication would necessarily affect
future military policy.   Thus, those cases present the type of
claims the political question doctrine seeks to preclude from
judicial review--claims that required courts to determine the
wisdom of military policy.[13]   In contrast, as explained above,
this case requires the opposite.   It only requires a

_____

     [13]     Again, this case is quite different from cases where a
government contractor is itself performing an essential military
function.   See Al Shimari v. CACI Int'l, Inc., 658 F.3d 413, 423
(4th Cir. 2011) (Niemeyer, J., concurring) (holding that the
first Baker factor is implicated when a government contractor
performs interrogation on a military base because interrogations
were for military purposes and the military instructed on
interrogation techniques).   This distinction between essential
military functions and non-essential functions is illustrated
when comparing Al Shimari with Harris v. Kellogg, Brown & Root
Servs., Inc., 618 F. Supp. 2d. 400 (E.D. Pa. 2009).   In a
comprehensive opinion, Judge Fisher held that a negligence claim
by a military officer against the defendant for negligent
electrical maintenance was not a political question.   Id. at 432.
In that case, the defendant had exclusive control and duty to
keep the military base safe--in terms of building maintenance--
for the servicemen and women.   Id. at 405.

determination by the Court or fact-finder about what the Navy's policies and procedures regarding warning about the dangers of asbestos were, not whether they were correct.[14]

### d.  The Political Question Doctrine's Effect on the Government Contractor Defense

Finally, finding that Plaintiff's claims present a non-justiciable political question would upset years of jurisprudence in asbestos litigation and also call into doubt the applicability of Boyle to government procurement contracts.[15]  The Court cannot and, of course will not, under the guise of the political question doctrine, avoid the clear direction of Boyle.

In sum, the Court's adjudication of Plaintiff's claims against Defendants for failure to warn of the dangers of asbestos are justiciable.  While there may be political overtones to the Navy's choice of policies as to what warnings were permitted, if any, the Court may adjudicate the instant controversy without

-----

[14]     Defendants argue that if Plaintiff is successful the Court would upset the Naval chain of command vis-à-vis hazard warnings.  This is not the case.  Under the government contractor defense, if the Navy had a policy for contractor warnings that met the Boyle test, Defendants would be immune from liability. Defendants' chain of command argument goes to the heart of Boyle's government contractor defense.

[15]     The brief of the respondent (the government contractor) in Boyle invoked several of the Baker factors in support of a sweeping government contractor defense.    Brief for Respondent at 17, 22-28, Boyle v. United Techs. Corp., 487 U.S. 500 (1988) (No. 86-492).  The Supreme Court, however, did not discuss or base its holding upon the respondent's argument.

second guessing these judgements, thus staying clear from the province of the Executive or Legislature.

**IV.   CONCLUSION**

For the reasons set forth above, Defendants' motion will be denied.  An appropriate order shall follow.